**WO**

NOT FOR PUBLICATION

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| PRODUCTIVE PEOPLE, LLC, an Illinois limited liability company,<br><br>    Plaintiff,<br><br>vs.<br><br>IVES DESIGN, a sole proprietorship; AMELIA IVES, an individual; GODADDY.COM, INC.,<br><br>    Defendants. | No. CV-09-1080-PHX-GMS<br><br>**ORDER AND TEMPORARY RESTRAINING ORDER** |

Pending before the Court is the Application for a Preliminary Injunction or Alternatively for a Temporary Restraining Order of Plaintiff Productive People, LLC, against Defendants Ives Design, a Colorado company, and Amelia Ives, a resident of Colorado ("the Ives Defendants"). (Dkt. # 6.) For the following reasons, the Court declines to grant a preliminary injunction, but grants a temporary restraining order.

**BACKGROUND**

Plaintiff is an Illinois company that, in its own words, "focuses on electronic publishing services, namely, publication of text and graphic works of others online featuring information and accomplishments of individuals and publishing of electronic publications." (Dkt. # 1 at 4.) In 2008, Plaintiff began making use of the term "namedrop" in conjunction

1   with offering these services. At some point, Plaintiff began using www.namedroponline.com,
2   which offers "extraordinary access" to "connect [users] with the world's biggest names."
3   (Dkt. # 6 Ex. F ex. 2.) Plaintiff attests that it has spent approximately $20,000 promoting the
4   "namedrop" brand as a "news and entertainment source for the world's celebrities," including
5   by sponsoring an Oscar's party in Los Angeles for celebrities during the Academy Awards,
6   by making presentations to potential partners, and by using the mark on promotional
7   materials. (Dkt. # 6 Ex. F at 1.)

8   Defendant Ives Design, however, holds the internet registration for the website
9   www.namedrop.com, which was first purchased in 1997. The website was not used until
10  2000, at which point it purported to offer custom branding services for business promotion,
11  but the site lacked any ordering or contact capability. (*See* Dkt. # 6 Ex. E ex. 14.) In 2004
12  the site had an "under construction" statement with general web information listed. (*Id.* ex.
13  15.) By 2007 even this page had been removed (*id.* ex. 16), and the site remained vacant
14  until after litigation in this matter commenced.

15  In 2008, Plaintiff contacted the Ives Defendants and attempted to purchase the
16  website. On January 14, 2009, after attempts at negotiation were unavailing, Plaintiff filed
17  a trademark application for the word mark "NAMEDROP" with the United States Patent and
18  Trademark Office. (Dkt. # 6 Ex. F ex. 1.) Two weeks later, on January 28, Plaintiff filed suit
19  against the Ives Defendants in the United States District Court for the Central District of
20  California, asserting various claims for trademark infringement, cybersquatting, and unfair
21  competition.

22  After the complaint was filed in the California district court, the Ives Defendants
23  updated the www.namedrop.com website. The site again purports to offer "custom
24  branding" services (such as on mugs, pins, magnets, and other merchandise) to "promote
25  your organizations and events," but it now includes "contact us" and "get a quote" links.
26  (Dkt. # 6 Ex. E ex. 10.) In an affidavit, Plaintiff's founding partner attests that:

27
> multiple celebrity providers, partners, and media contacts have expressed explicit confusion over the domain name "namedrop.com," believing the content on that website to be
28

> that of Productive People, forming a negative opinion concerning Productive People and its services. These individuals have personally told me that they had thought that website was associated with Productive People or expressed concern, or may not even be doing business, with Productive People because of the Ives Defendants['] use of the domain name.

(Dkt. # 6 Pt. 7 at 2.) Plaintiff further asserts that it is planning a "national marketing blitz" for the "next few weeks," and it anticipates that the damage that it suffers from this confusion will increase significantly during that time. (*Id.*)

In the California case, Plaintiff eventually advanced a motion for a preliminary injunction. (Dkt. # 6 Ex. C.) The Ives Defendants responded, and they also argued that the case should be dismissed for lack of personal jurisdiction. (Dkt. # 6 Ex. H.) The court agreed that the case should be dismissed without prejudice for a lack of personal jurisdiction, and the court denied the application for a preliminary injunction as moot. (Dkt. # 6 Ex. L.)

After the California action was dismissed, Plaintiff's trademark application was published for opposition on the principal register. (Dkt. # 6 Ex. K ex. 19.) The publication states that the applied-for mark will cover "[e]lectronic publishing services, namely, publication of text and graphic works of others online featuring information and accomplishments of individuals; publishing of electronic publications." (*Id.*)

On May 20, 2009, Plaintiff filed the Complaint underlying this action, asserting claims for trademark infringement under federal law, cybersquatting, common law trademark infringement, unfair competition, and unjust enrichment against the Ives Defendants, as well as federal and common law contributory infringement against Defendant GoDaddy.com.[1] (Dkt. # 1.) In the instant motion, Plaintiff argues that the Court should accept the briefing submitted on this issue in the California case and summarily grant a preliminary injunction

---

[1] Defendant Ives Design registered the domain names at issue with Defendant GoDaddy.com, Inc., an Arizona corporation. (Dkt. # 6 Ex. E ex. 9.)

- 3 -

against the Ives Defendants transferring the www.namedrop.com website to Plaintiff.[2] (Dkt. # 6.) In the alternative, Plaintiff requests a temporary restraining order enjoining infringing use of the website pending resolution of the motion for a permanent injunction.[3] (*Id.*)

**DISCUSSION**

**I.     Application for a Summary Preliminary Injunction**

Plaintiff's argument that the Court should accept the briefing from the California case and summarily grant a preliminary injunction – without giving Defendants an opportunity to respond – is meritless. Plaintiff has moved for a preliminary injunction under Federal Rule of Civil Procedure 65, and that rule "has been interpreted to mean that parties have a right to be heard in opposition to a motion for a preliminary injunction." *Int'l Molders' & Allied Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547, 554 (9th Cir. 1986). Plaintiff offers no authority in support of its argument that a response to a similar application in another court divests a party of the right to respond to a new application for a preliminary injunction in a different court. Plaintiff's only citation is to Federal Rule of Civil Procedure 1, which requires that the rules be "construed and administered to secure the just, speedy, and inexpensive determination of every action and proceeding." But to deprive Defendants of the right to respond simply because they have responded before is not "just," and it does not comport with Defendants' right to be heard in opposition to the motion.

Plaintiff's argument that the California district court has already decided this issue likewise does not hold water. Plaintiff asserts that the court determined that "upon proof of ownership, Plaintiff has suffered actual harm by the Ives Defendants' use" of the websites at issue. (Dkt. # 6 at 7.) The California district court made no such determination. Rather,

---

[2] Plaintiff requests that the injunction also apply to the websites www.name-drop.com and www.name-drops.com. (Dkt. # 62.) These websites are likewise owned by Defendant Ives Design (Dkt. # 6 Ex. E ex. 3), and as of the date of this Order they are identical to www.namedrop.com. As there is no evidence in the record to distinguish between the sites, the Court will evaluate all three under the same analysis.

[3] As discussed at the hearing on this matter on May 28, 2009, Plaintiff provided Defendants with adequate notice of their Application and of the date and time of the hearing.

1 the court, in the course of evaluating whether it had personal jurisdiction, undertook to
2 determine whether specific jurisdiction existed. The specific jurisdiction test required the
3 court to determine whether the Ives Defendants "purposefully directed" activities toward
4 California or "purposefully availed" themselves of the privilege of conducting activities in
5 California. *See Boschetto v. Hansing*, 539 F.3d 1011, 1016 (9th Cir. 2008). As part of its
6 analysis, the court utilized the "effects test" from *Calder v. Jones*, 465 U.S. 783 (1984),
7 which requires that a defendant have "(1) committed an intentional act, (2) expressly aimed
8 at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the
9 forum state." *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199,
10 1206 (9th Cir. 2006) (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 803
11 (9th Cir. 2004)).

12 After determining that the Ives Defendants had not "expressly aimed" any act at
13 California, the court also went on to reach the third prong of the *Calder* "effects test." In the
14 course of holding that Plaintiff had not established that the Ives Defendants knew that their
15 actions were likely to cause harm in California, the court noted in passing that Plaintiff had
16 sufficiently alleged the causation aspect of the third prong: "In the instant case, Plaintiff
17 sufficiently alleges a prima facie case for the causation component. If Productive People
18 indeed had rights in the Namedrop mark, it suffered harm in California, where it conducts
19 significant business, when Defendants inappropriately used the mark." (Dkt. # 6 Ex. L at
20 13.)

21 The finding that Plaintiff sufficiently alleged a prima facie case of causation for
22 purposes of the "effects test" in no way equates to a finding that Plaintiff actually suffered
23 harm for the purposes of granting a preliminary injunction. The court's statement, which in
24 any event is dicta, goes no further than to discuss the sufficiency of allegations of causation;
25 it does not make any finding regarding actual harm. Regardless, as explained below, a
26 finding of harm is not sufficient to establish that a preliminary injunction is warranted.
27 Rather, the relevant inquiry involves consideration of the balance of the hardships, the
28 likelihood of success on the merits, and several other facets. *See Bernhardt v. Los Angeles*

*County*, 339 F.3d 920, 925 (9th Cir. 2003). Thus, summary grant of a preliminary injunction would still not be proper.[4] The Court therefore will not enter a preliminary injunction before Defendants have had an opportunity to be heard.

## II. Application for a Temporary Restraining Order

Because summary entry of a preliminary injunction is not warranted, the Court is left with Plaintiff's alternative request for a temporary restraining order. (Dkt. # 6 at 12.) "The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Brown Jordan Int'l, Inc. v. Mind's Eye Interiors, Inc.*, 236 F. Supp. 2d 1152, 1154 (D. Haw. 2002). "[T]o obtain a preliminary injunction, the moving party must show either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips in its favor." *Roe v. Anderson*, 134 F.3d 1400, 1402 (9th Cir. 1998) (quoting *United States v. Nutri-cology, Inc.*, 982 F.2d 394, 397 (9th Cir. 1992)). "These two formulations represent two points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases." *Id.* (quoting *Nutri-cology*, 982 F.2d at 397). The Court will address each of the two ends of the spectrum in turn.

## I. Probability of Success on the Merits

Under the briefing as it now stands, Plaintiff has sufficiently established a likelihood of success on the merits to warrant entry of a temporary restraining order.[5] "To prevail on

---

[4]Plaintiff's only other argument is that the Ives Defendants "continue to dodge service." (Dkt. # 6 at 9.) Plaintiff makes no attempt to attach this to any legal argument regarding the motion for a preliminary injunction. The only authority Plaintiff offers is several criminal cases pointing out that a factfinder can infer consciousness of guilt from flight and evasive behavior. These cases have nothing to do with the underlying issues of the Application and provide no basis for granting a preliminary injunction.

[5]"In a trademark infringement claim, irreparable injury may be presumed from a showing of likelihood of success on the merits. This presumption effectively conflates the dual inquiries of this prong into the single question of whether the plaintiff has shown a likelihood of success on the merits." *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 n.4 (9th Cir. 2000) (internal quotations and citations omitted).

- 6 -

1  a claim under the Lanham Act, [the plaintiff] must establish that [the defendant] is using a
2  mark confusingly similar [to] its own." *GoTo.com*, 202 F.3d at 1205.  "[M]ore precisely,
3  because we are at the preliminary injunction stage, [a plaintiff] must establish that it is likely
4  to be able to show a likelihood of confusion."[6] *Id.* (quotation and ellipsis omitted).  A
5  likelihood of confusion is established by use of the eight factors outlined in *AMF Inc. v.*
6  *Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).[7]  Those factors are: (1) the strength
7  of the mark; (2) the proximity of the goods; (3) the similarity of the marks; (4) evidence of
8  actual confusion; (5) marketing channels used; (6) the type of goods and the degree of care
9  likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and
10 (8) the likelihood of expansion of the product lines.  *Id.*

---

[6]In addition to showing a likelihood of confusion, Plaintiff must also show that it owns a valid trademark.  *See Grocery Outlet Inc. v. Albertson's Inc.*, 497 F.3d 949, 951 (9th Cir. 2007).  The Ives Defendants did not offer any argument to the contrary in the California action, and thus this point does not appear to be at issue between the parties.  Regardless, on review of the record as it now stands, Plaintiff has sufficiently established ownership of a valid trademark to succeed on its Application for a temporary restraining order.  In the absence of a registered trademark presumption (as in this case), the Court must determine the distinctiveness of the mark and which party first made commercial use thereof.  *See Glow Indus., Inc. v. Lopez*, 252 F. Supp. 2d 962, 976-77, 980-81 (C.D. Cal. 2002).  Here, the term "namedrop" is suggestive, and therefore inherently distinctive, because it does not actually describe the service's features, but rather it only suggests them, requiring a degree of imagination or reasoning to understand the nature of the service.  *See id.* at 977.  Also, it appears from the record that Plaintiff was the first to engage in commercial use of the mark by advertising for the Academy Awards party, making sales presentations, and using promotional materials.  The Ives Defendants' earlier registration of a domain name was not inherently commercial use, *see Acad. of Motion Picture Arts & Sciences v. Network Solutions Inc.*, 989 F. Supp. 1276, 1281 (C.D. Cal. 1997), and until after litigation began the website itself was either blank or lacked sufficient functionality to constitute prior commercial use, *see Chance v. Pac-Tel Teletrac Inc.*, 242 F.3d 1151, 1156-57 (9th Cir. 2001).  Alternatively, any use would not be continuous given the fact that the site was blank for years before the California action was filed, with no indication of an intent to resume use, and thus any trademark rights would have been abandoned.  *See Star-Kist Foods, Inc. v. P.J. Rhodes & Co.*, 769 F.2d 1393, 1396 (9th Cir. 1985).  Therefore, as the record now stands, Plaintiff has established ownership of a valid trademark.

[7]*Sleekcraft* has been abrogated in part on other grounds.  *See Mattel, Inc. v. Walking Mountain Prods.*, 353 F.3d 792, 810 n.19 (9th Cir. 2003).

1    "In the context of the Web in particular, the three most important *Sleekcraft* factors
2    are (1) the similarity of the marks, (2) the relatedness of the goods or services, and (3) the
3    simultaneous use of the Web as a marketing channel." *GoTo.com*, 202 F.3d at 1205 (internal
4    quotations omitted).  The Court will address those three factors first and then go on to
5    address the remaining five factors.  On balance, the Court finds this case analogous to
6    *Brookfield Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036 (9th Cir.
7    1999), and therefore concludes that Plaintiff has established a likelihood of consumer
8    confusion based on the record as it now stands.

9    **(1) The Similarity of the Marks**

10   "The similarity of the marks will always be an important factor," and "the more
11   similar the marks in terms of appearance, sound, and meaning, the greater the likelihood of
12   confusion."  *Id.* at 1054.  Moreover, "similarities [are] weighed more heavily than
13   differences."  *Id.*  However, "the marks must be considered in their entirety and as they
14   appear in the marketplace."  *Id.* (internal quotations omitted).

15   Here, there is complete identity between the allegedly infringing www.namedrop.com
16   and Plaintiff's use of "namedrop" as a trademark.  The Ninth Circuit has found that the use
17   of the same term as a trademarked word in an internet address does not undermine the
18   complete identicality of the marks.  *See id.* at 1055 (collecting cases and finding that the
19   mark "MOVIEBUFF" and the website www.moviebuff.com were, "for all intents and
20   purposes, identical in terms of sight, sound, and meaning," and concluding that "the
21   similarity factor weighs heavily in favor of [granting a preliminary injunction]").  Thus, this
22   factor strongly suggests a likelihood of confusion.

- 8 -

1         **(2) The Relatedness of the Goods or Services**

2         "Related goods are generally more likely than unrelated goods to confuse the public
3 as to the producers of the goods." *Id.* Where, as here, the marks are identical, "confusion
4 would follow as a matter of course" if the marks "were used with identical products or
5 services." *Id.* at 1056. If, on the other hand, the parties "did not compete to any extent
6 whatsoever, the likelihood of confusion would probably be remote." *Id.* "Relatedness of
7 each company's prime directive isn't relevant" to this inquiry; rather, "the focus is on
8 whether the consuming public is likely somehow to associate [the defendant's] products with
9 [the plaintiff's]." *Id.*; *see also Garden of Life v. Letzer*, 318 F. Supp. 2d 946, 964 (C.D. Cal.
10 2004) ("The parties' goods need not be identical or directly competitive . . . . They need only
11 be related in some manner, or the conditions surrounding their marketing be such that they
12 could be encountered by the same purchaser under circumstances that could give rise to the
13 mistaken belief that the goods come from a common source.").

14         Here, the relatedness factor weighs at least slightly in favor of finding a likelihood of
15 consumer confusion. The services offered by the Ives Defendants – custom branding of
16 merchandise for business and event promotion (*see* Dkt. # 6 Ex. E ex. 10) – are clearly not
17 "identical" to the services offered by Plaintiff, which involve "[e]lectronic publishing
18 services, namely, publication of text and graphic works of others online featuring information
19 and accomplishments of individuals; publishing of electronic publications" (Dkt. # 6 Ex. K
20 ex. 19). However, neither are the services so completely dissimilar as to forestall any
21 possibility of consumer confusion.

22         *Brookfield* is again instructive on this point. In that case, the plaintiff owned the mark
23 for "MOVIEBUFF," under which it operated a searchable online database with detailed
24 information on films, while the defendant owned www.moviebuff.com, which rented and
25 sold video tapes, facilitated by an online database of more general film information. 174
26 F.3d at 1056. The Ninth Circuit held that the services were sufficiently related even though
27 the plaintiff's prime directive was to sell movie information, while the defendant's prime
28 directive was to rent and sell video tapes. *Id.* at 1056-57. The court so held because the

- 9 -

products were related "to some extent" and because the parties "offer[ed] products and services relating to the entertainment industry generally" and "to movies specifically." *Id.* at 1056.

Similarly, in this case, the fact that Plaintiff's prime directive is to sell promotional information, while the Ives Defendants' is to sell promotional labels, does not render the services completely unrelated. Both services generally involve the promotions industry, both make use of graphical works, and both offer the opportunity for self-promotion. Plaintiff's website, which employs the "namedrop" mark, advertises the opportunity for clients to "connect with the world's biggest names" and to gain "extraordinary access" thereto. (Dkt. # 6 Ex. F ex. 2). Similarly, www.namedrop.com offers clients the opportunity for self-promotion through "custom branding" to "promote your organizations and events" (Dkt. # 6 Ex. E ex. 10). Because Plaintiff's services likewise involve "publication of text and graphic works" (Dkt. # 6 Ex. K ex. 19), there is, like *Brookfield*, a great deal of potential overlap between the parties' consumers. *See* 174 F.3d at 1056 ("The relatedness is further evidenced by the fact that the two companies compete for the patronage of an overlapping audience."). While the relatedness of the services is not as compelling as that in *Brookfield*, the services are related enough to suggest that the consuming public is "to some extent" likely to associate the Ives Defendants' services with Plaintiff's. *See id.* Thus, this factor weighs at least slightly in favor of granting the temporary restraining order.

**(3) The Simultaneous Use of the Web as a Marketing Channel**

If both parties use the Web as a marketing and advertising facility, "courts have consistently recognized [this factor] as exacerbating the likelihood of confusion." *Id.* at 1057. Here, both parties use the Web as their primary marketing channel. Thus, this factor strongly weighs in favor of a finding that consumer confusion is likely.

The first and third factors strongly suggest a likelihood of confusion, while the second does so slightly. On balance, then, these three key factors counsel that there is a likelihood of consumer confusion. Although these three factors are the most important in this context, *see GoTo.com*, 202 F.3d at 1205, the Court will also address the other factors to the extent

1 that they apply to determine whether they "tip the scale back the other way." *Brookfield*, 174 F.3d at 1058.

### (4) The Strength of the Mark

"The stronger a mark – meaning the more likely it is to be remembered and associated in the public mind with the mark's owner – the greater the protection it is accorded by the trademark laws." *Id.* As discussed above in footnote six, the "namedrop" mark is suggestive. "[S]uggestive marks are presumptively weak," *id.*, and thus this factor would seem to favor the Ives Defendants' position. However, "[w]hether a mark is weak or not is of little importance where the conflicting mark is identical and the goods are closely related." *Id.* at 1059 (quoting 2 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 11:76 (4th ed. West 2009)). Here, the marks are identical and the services are, if not closely related, at least related enough to indicate a likelihood of consumer confusion. Thus, this factor carries only slight weight.

### (5) Evidence of Actual Confusion

"Evidence that the use of the two marks has already led to confusion is persuasive proof that future confusion is likely." *Sleekcraft*, 599 F.2d at 352. Here, Plaintiff has produced evidence of confusion in the form of an affidavit attesting that "multiple celebrity providers, partners, and media contacts have expressed explicit confusion over the domain name 'namedrop.com,' believing the content on that website to be that of Productive People."[8] (Dkt. # 6 Pt. 7 at 2.) While the affidavit is undeniably vague, it offers at least some evidence of actual confusion. Therefore, this factor weighs somewhat in favor of Plaintiff.[9]

---

[8] Although this is hearsay evidence, the Court may consider it on a motion for a preliminary injunction or temporary restraining order. *See Houdini Inc. v. Goody Baskets LLC*, 166 F. App'x 946, 947 (9th Cir. 2006) ("[T]he district court did not abuse its discretion in considering hearsay and biased evidence of actual confusion because the rules of evidence do not strictly apply to preliminary injunction proceedings.").

[9] Even if it did not, this factor could not weigh in favor of the Ives Defendants. *See GoTo.com*, 202 F.3d at 1208 ("While evidence that the use of the two marks has already led to confusion is persuasive proof that future confusion is likely, the converse is not true. . . .

- 11 -

### **(6) The Degree of Care Likely to be Exercised by the Purchaser**

This factor does not significantly weigh in either direction. On the one hand, if the "reasonably prudent customer" is relatively sophisticated, there is less of a likelihood of confusion. *See Brookfield*, 174 F.3d at 1060. Here, the Ives Defendants seem to target businesses and events promoters for custom branding, and Plaintiff seems to target celebrity, business, and media professionals. All of these are relatively sophisticated consumers, and thus there is less of a likelihood of confusion.[10] *See id.* On the other hand:

> In the Internet context, in particular, entering a web site takes little effort – usually one click from a linked site or a search engine's list; thus, Web surfers are more likely to be confused as to the ownership of a web site than traditional patrons of a brick-and-mortar store would be of a store's ownership.

*Id.* at 1057; *see also GoTo.com*, 202 F.3d at 1209 ("Navigating amongst web sties involves practically no effort whatsoever, and arguments that Web users exercise a great deal of care before clicking on hyperlinks are unconvincing."). Here, both parties make use of the internet, a medium inherently susceptible to easy confusion, which weighs in favor of Plaintiff. The Court concludes that, under the circumstances, these competing considerations cancel out, rending this factor indeterminate.

### **(7) The Defendant's Intent in Selecting the Mark**

"This factor favors the plaintiff where the alleged infringer adopted his mark with knowledge, actual or constructive, that it was another's trademark." *Brookfield*, 174 F.3d at 1059. Evidence that a party was attempting to engage in cybersquatting is relevant to a determination of malicious intent. *See id.* n.20 (citing *Minn. Mining & Mfg. Co. v. Taylor*,

---

[E]ven if [a defendant] could show . . . that no one was actually confused, it would by no means refute a likelihood of confusion.") (internal quotation omitted).

[10]The Court is viewing the Ives Defendants' case at its strongest, for it is also possible that relatively unsophisticated consumers are envisioned by both parties' services. If both sophisticated and unsophisticated consumers are at issue, then the degree of care exercised by both should be considered, *see Brookfield*, 174 F.3d at 1060, and that would add even more weight to Plaintiff's argument that consumer confusion is likely.

- 12 -

21 F. Supp. 2d 1003, 1005 (D. Minn. 1998)). Under the Anticybersquatting Consumer Protection Act:

> A person shall be liable in a civil action by the owner of a mark . . . if, without regard to the goods or services of the parties, that person (i) has a bad faith intent to profit from that mark . . . and (ii) registers, traffics in, or uses a domain name that . . . is identical or confusingly similar to that mark.

15 U.S.C. § 1125(d)(1)(A) (Supp. 2008). A person's failure to use the domain name "in connection with the bona fide offering of any goods or services," and a person's "registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others," are both indicative of a bad faith intent to profit from the mark. *Id.* § 1125(d)(1)(B)(i)(III), (VIII).

Here, Plaintiff provides evidence that the Ives Defendants have registered 140 websites, 125 of which contain only "parked" pages with no content and the remainder of which have no functional content (i.e., the links are dead, link to each other, or link to third-party websites without serving any apparent purpose). (Dkt. # 6 Ex. E at 1.) Plaintiff points out that, until litigation was filed in this case, the websites at issue here were similarly "parked" or functionally useless pages without contact capabilities for any goods or services. (*See* Dkt. # 6 Ex. E ex. 10, 14-16.) The Ives Defendants characterized this behavior in the California action as "mere coincidence" (Dkt. # 6 Ex. H at 14), but the Court concludes that Plaintiff has made out a colorable claim for cybersquatting based on this evidence. Thus, as the record now stands, this factor weighs in favor of Plaintiff.[11] *See Brookfield*, 174 F.3d at 1059 n.20; *Taylor*, 21 F. Supp. 2d at 1005.

**(8) The Likelihood of Expansion of Product Lines**

---

[11]Even if this is insufficient evidence of cybersquatting, this factor would not weigh in favor of the Ives Defendants, but rather would be indeterminate. *See Brookfield*, 174 F.3d at 1059 ("[T]he presence of intent can constitute strong evidence of confusion. The converse of this proposition, however, is not true: the lack of intent by a defendant is largely irrelevant in determining if consumers likely will be confused as to source.") (quotation omitted).

- 13 -

1       "[A] 'strong possibility' that either party may expand his business to compete with the 2 other will weigh in favor of finding that the present use is infringing." *Sleekcraft*, 599 F.2d 3 at 354.  There does not appear to be any evidence in the record relating to the possible 4 expansion of product lines.  However, both parties operate generally in the promotions 5 industry, and both involve self-promotion by graphic works, and thus there is some potential 6 for each party's future expansion into the other's market.  Given these considerations, this 7 factor does not mitigate against the entry of a temporary restraining order in this context.

8       Upon consideration, these five additional factors do not change the Court's conclusion 9 that there is likelihood of consumer confusion.  The strength of the mark weighs weakly 10 against Plaintiff, while evidence of actual confusion and the Ives Defendants' intent weighs 11 more strongly in Plaintiff's favor (and even if they did not, could not weigh in favor of the 12 Ives Defendants).  The degree of consumer care and the likelihood of expanding product 13 lines do not weigh in either direction.  On balance, these five factors confirm the Court's 14 conclusion based on the three most important factors that consumer confusion is indeed 15 likely.  Plaintiff has therefore established a probability of success on the merits of its 16 infringement claim.

17 **II.     Balance of the Hardships**

18       At the other end of the injunctive relief spectrum is the inquiry of whether "serious 19 questions are raised [by the movant] and the balance of hardships tips in its favor." *Roe*, 134 20 F.3d at 1402.  As the foregoing discussion demonstrates, Plaintiff clearly raises serious 21 questions about the merits of its claim.  However, Plaintiff has not demonstrated that the 22 "balance of hardships tips sharply in [its] favor." *GoTo.com*, 202 F.3d at 1205 (internal 23 quotations omitted).  Plaintiff states that it has been contacted by "celebrity providers, 24 partners, and media contacts," who have stated that they may be forming a negative opinion 25 of Plaintiff because of the nature of the services offered on www.namedrop.com. (Dkt. # 6 26 Pt. 7 at 2.)  Plaintiff further suggests that its upcoming media "blitz" may increase such 27 confusion.  (*Id.*)  This is some indication that Plaintiff would suffer harm from continued 28 operation of the websites at issue, although the extent of that harm cannot be determined

- 14 -

from the affidavit provided by Plaintiff.  Enjoining use of the Ives Defendants' websites, however, will almost certainly have the effect of shutting down their business entirely, depriving the Ives Defendants of whatever revenue they receive therefrom.[12]  The Ives Defendants pointed this out in the California action by stating that "stripping the Ives Defendants of their access to the [www.namedrop.com] website that they have owned since 1997 threatens costs and damages."  (Dkt. # 6 Ex. H at 16.)  Defendants' argument, while terse, is sufficient to raise the point that enjoining use of a business will cause monetary losses.  In sum, the hardships in this case, involving indeterminate loss of revenue on either side, generally cancel out.  It would therefore be improper to grant a temporary restraining order based solely on the balance of the hardships.

However, if the Court concludes that a plaintiff has demonstrated a likelihood of success on its Lanham Act claim, the Court may presume irreparable injury and need not conclude that the balance of hardships tips sharply in the plaintiff's favor.  *GoTo.com*, 202 F.3d at 1209.  Because Plaintiff has demonstrated that it is likely to prevail on the merits of its Lanham Act claim, it is entitled to a temporary restraining order.  *See id.*

## CONCLUSION

The Court will not summarily enter a preliminary injunction without giving Defendants an opportunity to respond.  However, because Plaintiff has established a likelihood of success on the merits as the briefing now stands, Plaintiff is entitled to a temporary restraining order pending full briefing and a hearing on the preliminary injunction.

**IT IS THEREFORE ORDERED** that Plaintiff's Application for a Preliminary Injunction or Alternatively for a Temporary Restraining Order (Dkt. # 6) is **GRANTED IN PART** and **DENIED IN PART**.

---

[12]Plaintiff has argued that it is facially apparent that these websites are not genuine businesses even now (Dkt. # 6 Ex. C at 18-19), but such an inference does not appear from the record.  The websites contain contact links for making use of the custom branding business, and in the absence of further evidence on the matter, the Court is unable to conclude that the business is a sham.

1    **IT IS FURTHER ORDERED** that Defendants Ives Design and Amelia Ives are
2    enjoined for a period of **ten (10) days** from **5 p.m.** on **Friday, May 29, 2009** (the date and
3    time of the issuance of this order) from operating the following websites
4    www.namedrop.com, www.name-drop.com, and www.name-drops.com or otherwise making
5    use of the term "namedrop" in conjunction therewith.

6    **IT IS FURTHER ORDERED** that this Order is binding on Defendant Ives Design
7    and Amelia Ives; their officers, agents, servants, employees, and attorneys; and any person
8    acting in concert or participation with anyone previously described and having actual notice
9    hereof.

10   **IT IS FURTHER ORDERED** that, pursuant to Federal Rule of Civil Procedure
11   65(c), Plaintiff is required to post a $5,000 bond as security for this temporary restraining
12   order.

13   **IT IS FURTHER ORDERED** that this case is placed on an expedited briefing
14   schedule given the nature of the temporary restraining order.  Defendants shall have up to
15   and including **5 p.m.** on **Wednesday, June 3, 2009**, to file (1) a notice of appearance and (2)
16   a response to Plaintiff's Application for a Preliminary Injunction.

17   **IT IS FURTHER ORDERED** that Plaintiff shall have up to and including **11 a.m.**
18   on **Friday, June 5, 2009**, to file a reply.

19   **IT IS FURTHER ORDERED** setting a hearing on the Application for a Preliminary
20   Injunction for **Friday, June 5, 2009** at **3 p.m.** in Courtroom 602, Sandra Day O'Connor U.S.
21   Federal Courthouse, 401 W. Washington St., Phoenix, Arizona 85003-2151.

22   **IT IS FURTHER ORDERED** directing Plaintiff to serve notification of this Order
23   upon all Defendants.  Plaintiff is further directed to provide a copy of this Order to
24   Defendants via email within **twenty-four hours** of its issuance.

25   DATED this 29th day of May, 2009.

26
27   *G. Murray Snow*
       G. Murray Snow
       United States District Judge
28